#CHAR 000128

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**

FILED

APR 28 2010

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

| | |
|---|---|
| DELORICE BRAGG, as Administratrix<br>of the Estate of Don Israel Bragg,<br>and<br>FREDA HATFIELD, as Administratrix<br>of the Estate of Ellery Hatfield,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No. 2:10-0683 |

## COMPLAINT

Plaintiffs Delorice Bragg, as Administratrix of the Estate of Don Israel Bragg, and Freda Hatfield, as Administratrix of the Estate of Ellery Hatfield ("Plaintiffs"), by and through their undersigned counsel, for their claims against Defendant United States of America ("United States"), pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), allege and state as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Delorice Bragg is a citizen of West Virginia, domiciled in Logan County, West Virginia, and is the duly qualified and acting Administratrix of the Estate of Don Israel Bragg, deceased, who died on or about January 19, 2006, at the Aracoma Alma No. 1 Mine ("Alma Mine"), in Logan County, West Virginia.  Plaintiff Delorice Bragg brings this Action for the benefit of her deceased husband's wrongful death beneficiaries under the provisions of W. Va. Code §§ 55-7-7, *et seq.*

2.     Plaintiff Freda Hatfield is a citizen of West Virginia, domiciled in Mingo County, West Virginia, and is the duly qualified and acting Administratrix of the Estate of Ellery "Elvis" Hatfield, deceased, who died on or about January 19, 2006, at the Aracoma Alma No. 1 Mine, in Logan County, West Virginia.  Plaintiff Freda Hatfield brings this Action for the benefit of her deceased husband's wrongful death beneficiaries under the provisions of W. Va. Code §§ 55-7-7, *et seq.*

3.     The United States of America is a sovereign state.  Liability for the acts described herein is based on actions of agents and employees of the United States Mine Safety and Health Administration ("MSHA"), an agency of the United States, for which sovereign immunity is waived under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*

4.     This Court may properly exercise original jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. § 1346(b)(1), 28 U.S.C. § 1331, and 28 U.S.C. § 2674.

5.     Venue is properly laid in the Southern District of West Virginia, Charleston Division, pursuant to 28 U.S.C. § 1402(b).  The events and the acts complained of giving rise to this action occurred within Logan County, in this District, and the Plaintiffs each reside in this District.

6.     West Virginia law applies to this action.

7.     The Plaintiffs have exhausted the administrative requirements set forth in 28 U.S.C. § 2675, by each submitting Form SF-95, Claim for Damage, Injury, or Death to the United States Department of Labor, Council for Claims and Compensation, Office of the Solicitor of Labor, 200 Constitution Avenue NW, Suite S4325, Washington, DC 20210, on or about January 17, 2008.

8.     The Plaintiffs have received no response regarding their Claims for Damage, Injury, or Death in the more than two years that have elapsed since they submitted their Claims, despite the Plaintiffs' repeated overtures to the Department of Labor to enter into a good faith resolution of their valid claims.  With the fourth anniversary of their husbands' tragic and untimely deaths

having recently passed, the widows now feel compelled to seek resolution of their claims in this Court.

## FACTUAL BACKGROUND

### The Aracoma Alma No. 1 Mine

9.     The Alma Mine is an underground coal mine located near the town of Stollings in Logan County, West Virginia.  The Alma Mine, which is operated by Massey Energy Company subsidiary Aracoma Coal Co., Inc., opened for production under Aracoma's control on October 1, 1999.

10.     The Alma Mine is very large and consists of a maze of underground passages that cover approximately six square miles.

11.     The workers at the Alma Mine used a technique called longwall mining to extract coal from the underground Alma coal seam.  Coal is mined from longwall panels, which are between 3,600 and 6,000 feet long and approximately 1,000 feet wide.  A longwall mining machine starts at one end of the 1,000 foot-wide face and, moving across the face, shears coal from the entire width.

12.     In order to carry the sheared coal from the longwall panel toward the surface, an elaborate system of high-speed belt conveyors is employed.  Each longwall section has a longwall mother belt, which, in conjunction with other belt lines in the mine, then carries the coal outside.

13.     Because the longwall mining process removes very large expanses of coal, the subterranean support for the mountain above is compromised in the process.  The mountain will collapse to fill in the space where the coal seam once stood.  In order to get the coal out of the mine, it has to be carried away on high-speed conveyor belts.  However, the miners must also ensure that the mountain does not collapse onto the belt itself.  As such, the belt is taken up as the mining process proceeds.  The sections of the belt that are automatically taken up are stored in the mother drive storage unit.

14.   In the process of removing coal from the mine on the conveyer belts, combustible coal dust accumulates around the belts.  Together with the friction caused by the high speed at which the belts operate, the combustible coal dust can create a high risk of fire and/or explosion if not properly cleaned and disposed of as required by federal law.

### The Fatal Fire of January 19, 2006

15.   On the afternoon of January 19, 2006, Mr. Bragg and Mr. Hatfield entered the mine to begin the evening shift.  There were 29 miners who worked that evening producing coal on one longwall section and on a continuous miner section known in the mine as "2 Section."

16.   Mr. Bragg and Mr. Hatfield worked as roof bolt machine operators on 2 Section along with 10 other miners.  As roof bolters, Mr. Bragg and Mr. Hatfield were responsible for stabilizing the roof in new sections of the mine in preparation for the longwall mining process.

17.   At approximately 5:05 p.m., Bryan Cabell, the evening shift belt examiner, shut down the longwall mother belt because he said he noticed an unacceptably large amount of coal dust had accumulated around the mother drive storage unit.

18.   In addition, Mr. Cabell said he observed that the mother drive storage unit itself had a broken carriage that was causing the belt to become misaligned on its track.  The misalignment caused considerable friction between the belt itself and the belt bearings.  This misalignment problem had been noted earlier in the day on January 19, 2006 by dayshift belt examiner Carl White, who reported the same to foreman Dusty Dotson.  Mr. White also informed Mr. Cabell of this problem before the evening shift began.

19.   Concurrent with Mr. Cabell's observations, smoke began to emerge from the vicinity of the mother belt storage unit.  As the smoke began to intensify, Mr. Cabell noticed burning embers underneath the belt bearing against which the belt was rubbing.  Mr. Cabell called foremen Fred Horton and Pat Callaway for assistance.  Mr. Cabell informed them that a fire had begun at the mother drive storage unit.

20.   Mr. Callaway and miner Jonah Rose arrived shortly thereafter to help fight the fire.

21.   Mr. Callaway and Mr. Rose fully discharged the two available fire extinguishers in a futile attempt to douse the flames, but by that point, the fire had grown too large.

22.   Mr. Cabell then attempted to hook the available fire hose up to the water tap outlet near the site of the fire.  Unfortunately, the threads on the fire hose coupling did not match the threads on the outlet, rendering the hose useless.

23.   Mr. Cabell then simply opened the water tap, hoping to be able to direct at least some water toward the area of the fire.  But there was no water in the water outlet.  Later, it was determined that the main water valve had been closed at the source, cutting off water to the area where the fire had started.

24.   To compound these safety violations, the sprinkler system with which the longwall mother belt was equipped failed to properly activate at the time of the fire.  Furthermore, there was no sprinkler system installed for the mother belt storage unit as required, which was one fuel source of this particular fire.

25.   While Mr. Cabell, Mr. Callaway and Mr. Rose struggled, unsuccessfully, to contain the fire, the smoke continued to increase significantly, several Atmospheric Monitoring System ("AMS") alarms were tripped to alert the miners of a dangerous level of Carbon Monoxide ("CO") in the mine.  However, Mike Brown, the mine dispatcher who had been working at the Alma Mine for only three weeks at that time, lacked the required training to perform the safety functions required of him.  As a result, he simply ignored the CO alarms that were activated in the early stages of the fire.

26.   By federal law, certain ventilation controls should have been installed in the mine so that the smoke would flow through the longwall section, keeping the miners' emergency escapeways clear of smoke.

27.   However, several ventilation control safety barriers, known as "stoppings," had been improperly removed at least five weeks earlier to expand mining operations, and those stoppings had not been replaced. As a consequence, the smoke began flowing in the wrong direction, deeper into the mine toward 2 Section and flooding the emergency escapeways.

28.  Additionally, in violation of federal law, the Alma Mine did not have functioning CO detectors in all areas of the mine.  Specifically, there was no CO detector in 2 Section.  Thus, Mr. Bragg, Mr. Hatfield and the remainder of the 2 Section Crew were not alerted to the looming danger.

29.  The smoke eventually became so thick that further attempts to fight the fire were futile. At 5:40 p.m., 35 minutes after Mr. Cabell shut down the longwall mother drive because a fire had started, partial evacuation of the mine finally began.  Mr. Cabell called Mr. Brown and ordered him to call the miners in 2 Section and alert them to evacuate the mine.

30.  When Mr. Brown called 2 Section, the 2 Section telephone was not working properly and, as such, there was no response.

31.  Mr. Brown next activated the signal light on the 2 Section telephone and again received no response.

32.  Finally, Mr. Brown remotely stopped one of the conveyor belts in 2 Section, which caused the 2 Section Crew to call Mr. Brown to determine why the belt had stopped.  Mr. Brown told the 2 Section Crew about the fire and ordered them to evacuate.

33.  Michael Plumley, the foreman of 2 Section, collected the members of his crew, and they began to evacuate the mine via a 14-man diesel-powered mantrip.

34.  However, they encountered serious problems in their evacuation.  As they were trained, Mr. Bragg, Mr. Hatfield, and the remainder of 2 Section Crew began their evacuation through the mine's primary escapeway.

35.  Because of the missing stoppings described above, smoke from the fire flooded the mine's primary escapeway and engulfed the members of the 2 Section Crew not long after they began their escape.

36.  The heavy smoke reduced visibility for the evacuating miners to only a couple of inches or less, prohibiting further evacuation by mantrip.  The miners disembarked from the mantrip and began attempting to feel their way out of the mine on foot.

37.   The 2 Section Crew tried to utilize their Self-Contained Self-Rescuers ("SCSRs"). However, the miners had not been properly trained in the use of these devices, and they had numerous problems in applying their SCSRs and getting them to work in the thick, black smoke that was quickly filling the escape route.  The miners dropped and lost parts from their SCSRs in the smoke, and became nauseated and blinded by the dense smoke.

38.   The mine was equipped with a secondary escapeway that could be used in the event that the primary escapeway was unusable, but the minors were left to inch along the coal rib, in total darkness and in considerable distress, searching for an unmarked personnel door that would lead them to safety.  Eventually, the personnel door was located.

39.   Once through that door, the group did a headcount and realized that only 10 miners had made it.  The two missing miners were Mr. Bragg and Mr. Hatfield.  Mr. Plumley and two other miners returned to the primary escapeway and called for Mr. Bragg and Mr. Hatfield several times, but received no response.  They then returned to the secondary escapeway and evacuated the mine.

40.   Those 10 miners made it out of the Alma Mine safely.  Tragically, Mr. Bragg and Mr. Hatfield did not.  Rescue and firefighting activities lasted for several days.  At 2:40 p.m. on January 21, 2006, almost two full days after the fire began, rescuers found the body of Don Bragg.  A short time later, at 3:20 p.m., the rescuers also located the body of Elvis Hatfield.

41.   The medical examiner's report for Mr. Bragg indicates that he died due to suffocation and carbon monoxide intoxication.  The medical examiner's report for Mr. Hatfield states his cause of death as carbon monoxide intoxication.

**The Mine Safety and Health Administration's Role In The Fatal Fire of January 19, 2006**

42.   On January 26, 2006, MSHA began its investigation into the causes of the fatal accident.

43.   The findings of the MSHA investigation were breathtaking.  MSHA found many discrete violations of the Mine Safety and Health Act by Aracoma Coal Company, Inc. that contributed to the cause of Mr. Bragg's and Mr. Hatfield's deaths.

44.   In MSHA's internal investigation of its own actions, it observed as follows:

MSHA's accident investigation team determined that the Aracoma Coal Company's failure to comply with numerous mandatory safety standards contributed to the cause and severity of the January 19, 2006, fatal fire.  Conditions and practices that violated the Mine Act, which are discussed in detail in this report, include:

- inadequate training;
- inadequate firefighting and emergency evacuation procedures;
- failure to adequately mark personnel doors along escapeways;
- failure to provide an audible and visual fire alarm at all affected working sections when carbon monoxide sensors used for early warning fire detection reached alarm levels;
- inadequate examination of these alarms and sensors;
- failure to promptly notify appropriate personnel of alarm signals;
- failure to promptly notify affected personnel of alarm signals and withdraw them to a safe location;
- failure to conduct adequate examinations and to ensure that hazardous conditions identified during examinations were posted, corrected, and recorded;
- failure to provide isolation for the primary escapeway;
- failure to conduct adequate escapeway drills;
- failure to prevent accumulations of combustible materials;
- failure to maintain a water supply to fight the fire directly;
- the incompatibility of the threads on the firefighting hoses and fire outlet valves;
- inadequate coverage of the water sprinkler system for the 9 Headgate longwall belt conveyor takeup storage unit;
- inadequate weekly examinations of the water sprinkler system;
- failure to conduct annual functional tests of fire hydrants and fire hoses;
- inaccurate mine maps;
- failure to conduct an immediate evacuation of miners working on 2 Section; and
- the operation of the 9 Headgate longwall belt conveyor in an unsafe condition.

*Internal Review of MSHA's Actions at the Aracoma Alma Mine #1 ("MSHA Review") at 2-3.*[1]

---

[1]      MSHA's internal investigative report, without exhibits, is attached as Exhibit "A."  The entire report, including exhibits, can be found at http://www.msha.gov/FATALS/2006/Aracoma/aracomareport.asp.

45.   The violations found by MSHA reflect all of the problems that the miners faced during that fire.  These numerous violations, individually and jointly, created the extremely hazardous condition in the Alma Mine which directly caused the deaths of Mr. Bragg and Mr. Hatfield.

46.   As a result of these violations, $4.2 million in civil and criminal fines were levied by MSHA and the United States against Aracoma Coal Company.  Aracoma Coal Company has agreed to pay those fines in full to the United States, and has also pled guilty to multiple mine safety crimes, including one felony.  At the time they were levied, these fines were believed to be the largest combined government penalty ever in a coal-mining death case.

47.   Under Section 103(a) of the Mine Safety and Health Act, MSHA is required to make a full and complete inspection of every underground mine at least four times per year.  According to MSHA's own procedures, these inspections require, among other things, inspection of the mine "in its entirety including air courses, escapeways, first aid equipment, ventilation facilities, communication installations, roof and rib conditions, fire protection and availability of potable water." *MSHA Review at 11.*

48.   Pursuant to this requirement, MSHA personnel from District 4 allegedly conducted four regular inspections of the Aracoma Mine between January and December 2005.  A fifth inspection began on January 3, 2006 and was ongoing at the time of the fire. *MSHA Review at 13.*  During that time, MSHA inspectors issued a total of 95 citations and orders at the Alma Mine. *MSHA Review at 19.*

49.   Following the fire, MSHA resumed the inspection that was in progress at the time and issued 299 citations, orders and safeguards. *Id.*

50.   However, the inspectors who issued the 95 pre-fire citations "*did not identify and cite numerous violations that were in existence*, neither did they require the mine operator to take corrective actions . . . ." *Id.* (emphasis added).

- 9 -

51.   Similarly, under Section 103(i) of the Mine Safety and Health Act, MSHA is required to conduct spot inspections of mines whenever the mine "liberates more than two hundred thousand cubic feet of methane or other explosive gas during a 24-hour period." *MSHA Review at 20*. In such circumstances, MSHA must provide one spot inspection every 15 working days at irregular intervals. *Id.*

52.   At the time of the fatal fire in this case, the Alma Mine was on a 15-day spot inspection schedule that began on March 1, 2003. *MSHA Review at 21*.

53.   Like the Section 103(a) inspections, MSHA did not properly conduct the spot inspections: "[MSHA personnel] failed to follow explicit Agency policy regarding Section 103(i) inspections." *MSHA Review at 25*. The inspectors failed to "undertake *reasonable efforts* to detect mine hazards" and committed a "*gross misallocation* of inspector resources." *Id.* (emphasis added). In short, "[i]nspectors routinely demonstrated a lack of initiative to appropriately conduct Section 103(i) inspections." *Id.*

54.   In all, MSHA found at least 20 specific safety violations that contributed to the accident that killed Mr. Bragg and Mr. Hatfield. For almost every violation, MSHA determined that its inspectors were at fault for failing to identify or rectify grave and obvious safety violations during its numerous inspections of the Alma Mine prior to the fire. For example:

    a.    <u>Failure to Confirm Training of Employees Who Were New to a Position</u>: MSHA concluded that "District 4 personnel assigned to inspect the Aracoma Alma Mine #1 did not determine whether the AMS operator was adequately familiar with his duties and responsibilities, even though this determination was required of and understood by the inspector." *MSHA Review at 44*. Mr. Brown, the dispatcher who ignored several CO alarms on the day of the fire, was the AMS operator. Had MSHA properly and appropriately determined that he was not adequately familiar with his duties and responsibilities, the 2 Section Crew would likely have been given a more timely order to evacuate.

- 10 -

b.   Ventilation Controls: "Enforcement personnel demonstrated a lack of initiative to identify and cite basic violations . . . even though the unmarked doors and missing stoppings were obvious and easily identifiable." *MSHA Review at 47.* Moreover, "[a]n adequate MSHA inspection of the airlock or 9 Headgate longwall belt electrical installations would have identified the missing stoppings." *MSHA Review at 48.* Of course, had the missing stoppings been identified, smoke would not have filled the primary escapeway, and Mr. Bragg and Mr. Hatfield would still be alive.

c.   Atmospheric Monitoring Systems: "District 4 personnel did not recognize and/or cite several violations . . . present during one or more inspections prior to the fatal fire. MSHA's accident investigation team determined that an alarm unit for 2 Section had never been installed as required. . . . An adequate inspection by MSHA would have identified the deficiencies with the AMS, including the fact that no alarm unit had been installed on 2 Section." *MSHA Review* at 52. If 2 Section had a CO detector, the miners in 2 Section, including Mr. Bragg and Mr. Hatfield, would have had notice of the fire far earlier and would have had a far better chance to safely evacuate.

d.   On-Shift Examinations of Conveyor Belts: "MSHA inspections of the belt entries and evaluation of the mine operator's on-shift examinations were inadequate . . . numerous other hazards were present in the belt entries and were not identified by mine examiners or MSHA inspectors prior to the fatal fire. These included belts operating in an unsafe condition, inadequate fire suppression systems, inadequate or deteriorated firefighting equipment . . . ." *MSHA Review at 72 - 73.* Obviously, had MSHA inspectors addressed the unsafe conditions of the belts, the fire would never have occurred. In addition, the miners were left to battle a growing and dangerous fire with hoses that did not fit the water outlets and with sprinkler systems that failed to activate. This situation would not have occurred had MSHA properly performed its duties.

- 11 -

e.   <u>Accumulation of Combustible Materials</u>:   "The widespread existence of accumulations of loose coal and coal dust on every belt flight . . . was indicative of indifference on the part of the mine operator to prevent such hazards coupled with ineffective use of MSHA's enforcement authority.  District 4 personnel . . . did not recognize or cite numerous violations." *MSHA Review at 104.*

55.   MSHA noted multiple other contributing violations, including inaccurate mine maps, escapeways that were not clearly marked, and sub-par firefighting equipment that was not available in sufficient quantities and was not properly and regularly tested. *See, e.g., MSHA Review at 41-129.*

56.   In every instance, MSHA noted the failure of its inspection personnel to inspect and remedy egregious safety violations that existed in the Alma Mine. *Id.* The existence of all of these contributing factors created a "perfect storm" that all but guaranteed a tragic accident.  Had even one of these major violations been properly and appropriately cited by MSHA, Mr. Bragg and Mr. Hatfield may not have died in the mine fire.

57.   The sheer number and egregiousness of the readily apparent safety violations at the Alma Mine, which should have been identified by MSHA personnel if they had performed adequate inspections during their repeated trips to the Alma Mine preceding the fatal fire, are sufficient to lead a reasonable observer to question the true nature of the relationship between the responsible MSHA personnel and company management.

58.   In fact, according to MSHA's internal investigation, there were reported tensions between an MSHA supervisor and Aracoma Coal management relating to the issuance of Mine Act Section 104(d) citations in early 2001, after which the Alma Mine was assigned new MSHA personnel. *See MSHA Review at 26-29.* At that time, the MSHA personnel responsible for inspecting the Alma mine underwent a joint mine safety training with Aracoma Coal's managers. *Id.* at 27-28.

59.   Immediately before the assignment of the new MSHA personnel and the joint training in mid 2001, MSHA personnel had issued a large number of Section 104(d) citations against Aracoma Coal. *See MSHA Review at 34-35.* However, from late 2001 through the date of the fatal fire in 2006, MSHA personnel did not issue a single Section 104(d) citation against Aracoma Coal, despite the fact that MSHA later found numerous violations in the Alma Mine which existed before the fatal fire, and which MSHA's inspectors were required to cite and take corrective action on under Section 104. *Id.* at 26-41. During this same time period, the MSHA personnel responsible for enforcement at the Alma Mine apparently did continue to issue Sections 104(d) actions against other mine companies. *Id.* at 34-35.

60.   MSHA's internal report states that:

> The internal review team has concluded that mine inspectors neglected to issue citations in some situations in which citations were justified and that mine inspectors on occasion underestimated the operator's negligence and/or the gravity of the hazardous conditions when violations were cited…. The failure to propose more significant civil penalties likely interfered with the deterrent value that civil penalties are designed to have under the Mine Act…. *[The internal review team believes that some of the identified deficiencies may have stemmed from the relationship that MSHA developed with Massey Energy Company representatives in early 2001….. [U]sing enforcement personnel in this manner to assist the Aracoma Coal Company with its compliance efforts may have created a conflict of interest that, over time, may have affected the level of scrutiny MSHA provided at Aracoma Alma #1 during subsequent mine inspections.]*

*MSHA Review at 40-41* (emphasis added).

61.   Whatever the true cause of MSHA's indefensible failure to perform its required inspection and enforcement duties may be, MSHA has already openly and freely admitted its proportionate responsibility for the incident that led to Mr. Bragg's and Mr. Hatfield's deaths: "the number and extent of conditions and practices adversely affecting the health and safety of miners at the mine also indicate that *MSHA did not utilize the Mine Act to effectively enforce health and safety standards promulgated to provide miners with the protections afforded by the statute*." *MSHA Review at 3* (emphasis added). Indeed, "[v]iolations at the [Alma Mine]

- 13 -

developed in an atmosphere of indifference on the part of the mine operator . . . *coupled with*

MSHA's failure to effectively utilize its enforcement authority and to perform the oversight

necessary to identify inspection shortcomings prior to the fatal fire." *Id.* (emphasis added).

62.   MSHA has also admitted that, had its inspectors performed their jobs more effectively,

the Aracoma Mine fire may have never happened:

> The internal review identified numerous weaknesses in MSHA's performance at
> the Aracoma Alma Mine #1.  Some involved oversights that have already been
> addressed and corrected.  However, fundamental factors that affected MSHA's
> performance included ineffective use of MSHA's enforcement authority coupled
> with inadequate supervisory and management oversight.  Inadequacies in these
> areas were manifested in the specific deficiencies identified in this report, and
> recommendations are provided to prevent the recurrence of such lapses.  *MSHA
> had policies and procedures in effect at the time of the fire that, if followed within
> District 4 and MSHA headquarters, would have improved performance and
> corrected a number of the deficiencies found at both the field office and District
> levels.*

*Id.* (emphasis added).

63.   Specifically, MSHA summarized the findings of its internal investigation as follows:

> As detailed in this report, the internal review team concluded that, to various
> degrees, one or more of the mine inspectors:
>
> - failed to exercise their authority in a manner that demonstrated an
>   appreciation of the importance of strict enforcement of the Mine
>   Act and its direct impact on the health and safety of miners;
> - failed to conduct inspections in a manner that reliably detected
>   violations and assured the prompt correction of hazardous
>   conditions;
> - lacked the technical support necessary to effectively evaluate and
>   address certain complex health and safety conditions; and
> - lacked sufficient familiarity and failed to comply with MSHA
>   policies and procedures that, if followed, would have significantly
>   improved the scope, quality, and effectiveness of mine inspections.
>
> As detailed in this report, the internal review team concluded that, to various
> degrees, supervisory personnel at the field office, district office, and MSHA
> national office levels:

- did not provide adequate supervision of inspection activities and failed to promote the importance of strict enforcement of the Mine Act and its direct impact on the health and safety of miners;
- did not effectively communicate that inspectors would have full agency support for appropriately utilizing Mine Act enforcement tools necessary to effectively address the hazards at the Aracoma Alma Mine #1; and,
- did not adequately engage in oversight activities, many of which were established in existing MSHA policies, that were necessary to quickly detect and correct the identifiable deficiencies associated with MSHA inspections at the mine.

Inadequate supervision and management contributed greatly to the failure of MSHA personnel to provide an adequate level of enforcement and follow established inspection procedures at the Aracoma Alma Mine #1. Ineffective use of MSHA's Performance Management System permitted poor performance to continue uncorrected. Additionally, MSHA's Accountability Program is fundamentally flawed in that weaknesses are identified but the root causes are not addressed to prevent recurrence of deficiencies. The program does not hold employees accountable for correcting and preventing deficiencies. These issues must be promptly and effectively addressed to prevent similar shortcomings in future inspections.

*MSHA Review at 4.*

64.  MSHA's culpability in the deaths of Mr. Bragg and Mr. Hatfield is clearly discerned from its own report, in which MSHA admits that "[t]he members of the internal review team were shocked by *the deplorable condition of the mine* and information that they gathered during the internal review precisely because it *demonstrated such a gross deviation from MSHA standards*." *Id. at 5* (emphasis added).

65.  The Office of the Inspector General similarly noted, on November 16, 2007, that "inspection activities were not performed or well-documented" by MSHA at the Aracoma Mine. *Inspector General Report at 17*, available at www.oig.dol.gov/public/reports/oa/2008/05-08-001-06-001.pdf.

66.  MSHA concluded its report by stating that:
It is the internal review team's conclusion that, in the year before the January 19, 2006, fatal fire at the Alma Mine # 1, MSHA did not conduct inspections in a manner that permitted us to effectively identify hazardous conditions at the mine, and did not utilize the Mine Act to effectively

enforce health and safety standards promulgated to provide miners with the protections afforded by the statute.  The Aracoma Coal Company's indifference to health and safety conditions at the Alma Mine #1 and MSHA's failure to more effectively enforce the Mine Act allowed significant hazards, many of which otherwise might have been identified and addressed, to continue in existence prior to the fatal fire.  *The Agency's culpability rests with all persons who directly or indirectly were responsible for administering the Mine Act at the Alma Mine #1*, from the inspectors who conducted the mine inspections through the headquarters office personnel who ultimately were responsible for overseeing MSHA activities throughout the Nation.

*MSHA Review at 180* (emphasis added).

## COUNT I – NEGLIGENCE AND WRONGFUL DEATH

67.   Plaintiffs incorporate by reference paragraphs 1 through 66 as if fully set forth herein.

68.   Under West Virginia law, private parties are liable when they voluntarily undertake a duty and then negligently carry it out.

69.   Moreover, under West Virginia law, private parties who engage in affirmative conduct, and thereafter realize or should realize that such conduct has created an unreasonable risk of harm to another, are under a duty to exercise reasonable care to prevent the threatened harm.

70.   By analogy, the United States is liable here for negligently executing a duty it undertook, and for failing to exercise reasonable care to prevent harm to the Plaintiffs caused by the United States' affirmative negligent conduct.

71.   The United States voluntarily, specifically, physically, and actually undertook a duty to render services to the miners at the Alma Mine, including Mr. Bragg and Mr. Hatfield.

72.   The United States undertook the duty to administer the provisions of the Mine Act, which requires, *inter alia*, that MSHA perform thorough, detailed, and regular inspections of active underground mines such as the Alma Mine at prescribed intervals, in order to enforce compliance with mandatory safety and health standards.

73.   The United States recognized or should have recognized that the careful rendering of those services were necessary for the protection of the miners, including Mr. Bragg and Mr.

Hatfield, and that performing those services in a negligent manner could lead to serious injury or death of the miners.

74.   The Plaintiffs reasonably relied upon the United States to undertake its inspections and enforcement actions in a competent and non-negligent manner, and that reliance ultimately contributed to the wrongful deaths of Mr. Bragg and Mr. Hatfield.

75.   The United States breached its duties to Mr. Bragg and Mr. Hatfield by failing to notice and/or cite numerous blatant, fundamental, and grave violations of federal mine safety regulations, as described above, and as detailed in MSHA's own internal investigation of its actions preceding the fatal fire at the Alma Mine.  These acts and/or omissions were not only a breach of the United States' duties to the Plaintiffs, but were violations of federal laws, regulations, and/or policies mandating the manner in which MSHA personnel were required to administer the provisions of the Mine Act.

76.   The United States, by its acts and/or omissions, failed to exercise reasonable care in performing and rendering services to the Plaintiffs, resulting in the deaths of Mr. Bragg and Mr. Hatfield.

77.   The United States' failure to exercise reasonable care in carrying out its inspection and enforcement activities increased the Plaintiffs' risk of harm, and the United States thereafter failed to take reasonable steps to prevent harm to the Plaintiffs resulting from its negligent affirmative acts.

78.   The United States' acts and/or omissions were the proximate cause of and/or a substantial contributing factor in causing the Plaintiffs' damages.

79.   As a direct result of the United States' tortious acts and/or omissions in these matters, the Plaintiffs' decedents suffered death, pain, impairment, and metal anguish, and the decedents' Estates suffered losses as set forth in West Virginia's Wrongful Death Act, West Virginia Code §§ 55-7-6(c)(1) and (2).

**WHEREFORE**, the Plaintiffs pray as follows:

(a)    that this Court award incidental and consequential damages arising from the

United States' negligence, in excess of $75,000.00 to Plaintiffs, Bragg and Hatfield; and

(b)    that this Court award such other relief as the Court deems just and

appropriate under the circumstances.


Respectfully submitted,


Bruce E. Stanley
WV Bar ID 35434
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
(412) 288-7254

April _28_, 2010                Counsel to Plaintiffs