UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DELORICE BRAGG,
as Administratrix of the
Estate of Don Israel Bragg, and
FREDA HATFIELD,
as Administratrix of the Estate of
Ellery Hatfield,

       Plaintiffs,

v.                           Civil Action No. 2:10-0683

UNITED STATES OF AMERICA,

       Defendant.

## MEMORANDUM OPINION AND ORDER

      Pending is the motion to dismiss of defendant United States of America ("United States"), filed June 25, 2010.  The statement of facts set forth in Part I below is taken from the plaintiffs' complaint.

I.

      Plaintiffs are representatives of the estates of their respective deceased husbands Don Israel Bragg ("Bragg") and Ellery Hatfield ("Hatfield").  Bragg and Hatfield were two miners who died during a fire at Aracoma Coal Company's Alma Mine ("Alma Mine" or "the mine") on January 19, 2006.  (See Compl. ¶¶ 9-41).

Bragg and Hatfield worked in "2 Section" of the mine as roof bolt machine operators.  (Id. ¶ 16).  While Bragg and Hatfield were on duty the evening of January 19, 2006, a fire broke out.  (Id. ¶ 19).  The mine facilities were ill-equipped to handle the blaze due to various inadequate safety measures implemented by Aracoma Coal Company ("Aracoma Coal").  (See id. ¶ 43).  After unsuccessfully attempting to extinguish the fire, various miners were forced to evacuate.  Early attempts to warn the 2 Section workers failed due to telephone malfunctions (id. ¶¶ 30-31), but those workers were eventually notified and began their evacuation as well.

The 2 Section workers encountered a number of obstacles in attempting to escape Alma Mine.  (Id. ¶¶ 32-34).  Due to a faulty ventilation system, smoke from the fire flooded the escape route and reduced visibility within the mine.  (Id. ¶ 36).  Although the workers attempted to utilize breathing devices called Self-Contained Self-Rescuers to deal with the smoke, they lacked the training necessary to operate these devices.  (Id. ¶ 37).

Ultimately, ten miners emerged from Alma Mine safely; Bragg and Hatfield were not among them.  (Id. ¶ 40).  On January 21, 2006, two days after the fire, rescuers found their bodies.

(Id.).  The medical examiner's report for Bragg attributes his death to suffocation and carbon monoxide intoxication.  (Id. ¶ 41).  The medical examiner's report for Hatfield cites carbon monoxide intoxication as the cause of death.  (Id. ¶ 41).

On January 26, 2006, the Mine Safety and Health Administration ("MSHA"), began investigating the Alma Mine fire.  (Id. ¶ 42).  MSHA determined that numerous violations of the Mine Safety and Health Act ("the Mine Act"), 30 U.S.C. § 801, et seq. by Aracoma Coal contributed to the cause and severity of the fatal fire.  (Id. ¶ 43).  Among Aracoma Coal's violations were "inadequate training; inadequate firefighting and emergency evacuation procedures . . . [and] failure to conduct an immediate evacuation of miners working in 2 Section."  (Id. ¶ 44 (citing Compl., Ex. A, Internal Review of MSHA's Actions at the Aracoma Alma Mine #1 ("MSHA Review") 2-3)).

MSHA's investigation also revealed the inadequacies of its own previous inspections of Alma Mine.  Indeed, the MSHA Review is aptly characterized as a comprehensive and stinging assessment of the Agency's multiple failures to properly police the mine.  For example, by late 2005, MSHA inspectors issued 95 citations to Aracoma Coal for safety violations but failed to "identify and cite numerous violations that were in existence,

3

neither did they require the mine operator to take corrective actions." (<u>Id.</u> ¶¶ 48-50 (citing MSHA Review 19)). Likewise, MSHA personnel breached "explicit Agency policy regarding Section 103(i) inspections [i.e., spot inspections]" by failing to "undertake reasonable efforts to detect mine hazards" and by exhibiting "a lack of initiative to appropriately conduct Section 103(i) inspections." (<u>Id.</u> ¶ 53 (citing MSHA Review 21)).

MSHA determined that its own inspectors were at fault for failing to identify or rectify many obvious safety violations that contributed to the fire. (<u>Id.</u> ¶ 54 (citing MSHA Review 104)). Specifically, MSHA concluded as follows:

> [I]n the year before the January 19, 2006, fatal fire at the Alma Mine #1, MSHA did not conduct inspections in a manner that permitted us to effectively identify hazardous conditions at the mine, and did not utilize the Mine Act to effectively enforce health and safety standards promulgated to provide miners with the protections afforded by the statute. The Aracoma Coal Company's indifference to health and safety conditions at the Alma Mine #1 and MSHA's failure to more effectively enforce the Mine Act allowed significant hazards, many of which otherwise might have been identified and addressed, to continue in existence prior to the fatal fire. The Agency's culpability rests with all persons who directly or indirectly were responsible for administering the Mine Act at the Alma Mine #1, from the inspectors who conducted the mine inspections through the headquarters office personnel who ultimately were responsible for overseeing MSHA activities throughout the Nation.

(<u>Id.</u> ¶ 66 (citing MSHA Review 180)).

4

Plaintiffs, the widows of Bragg and Hatfield, instituted this action on April 28, 2010, invoking the court's jurisdiction pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.  In Count I, the sole count of the complaint, plaintiffs assert claims under West Virginia law for negligence and wrongful death.  (See Compl. ¶¶ 67-79). Plaintiffs allege that "the United States is liable here for negligently executing a duty it undertook, and for failing to exercise reasonable care to prevent harm to the Plaintiffs caused by the United States' affirmative negligent conduct."  (Id. ¶ 70).

On June 25, 2010, the United States moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  It contends that (1) the Mine Act does not create an express or implied right of action to sue the United States for alleged violations of the Act, (2) the FTCA does not waive the sovereign immunity of the United States for violations of federal statutes and federal law, (3) plaintiffs' claims would not give rise to liability for a private person under West Virginia law, and the complaint therefore fails to state a claim upon which relief can be granted under the FTCA, (4) plaintiffs have failed to establish a waiver of sovereign

immunity by the United States with respect to its claims, and (5) the complaint fails to meet the requirement of Federal Rule of Civil Procedure 8 because it fails to allege sufficient facts to support its claim.  (Def.'s Mot. to Dismiss 1-2).

Inasmuch as the court's ruling on defendants' motion to dismiss turns on jurisdictional grounds pursuant to Rule 12(b)(1), the court has no occasion to reach defendants' contentions, made pursuant to Rule 12(b)(6), that plaintiffs' complaint alleges insufficient factual matter to state a claim that is plausible on its face.

II.

A.    Governing Standard for Rule 12(b)(1) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(1) permits a party to move for dismissal if the court lacks subject matter jurisdiction.  Federal district courts are courts of limited subject matter jurisdiction, possessing "only the jurisdiction authorized them by the United States Constitution and by federal statute."  United States v. ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2008).  As such, "there is no presumption that the court has jurisdiction." Pinkley, Inc. v. City of Frederick,

191 F.3d 394, 399 (4th Cir. 1999) (citing Lehigh Mining & Mfg. Co. v. Kelly, 160 U.S. 327, 327 (1895)). Indeed, when the existence of subject matter jurisdiction over a claim is challenged under Rule 12(b)(1), "[t]he plaintiff has the burden of proving that subject matter jurisdiction exists." Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999); see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991)). If subject matter jurisdiction is lacking, the claim must be dismissed. See Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).

**B.    The FTCA**

        Plaintiffs' claims are predicated on the United States' waiver of sovereign immunity under the FTCA. The FTCA "provides for 'a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment.'" Wood v. Standard Prods. Co., 671 F.2d 825, 829 (4th Cir. 1982) (quoting United States v. Orleans, 425 U.S. 807 (1976)); 28 U.S.C. § 1346(b)). Specifically, the FTCA makes the United States liable for torts "in the same manner and to the same extent as a private individual under like circumstances," 28

7

U.S.C. § 2674, "in accordance with the law of the place where the act or omission occurred," id. § 1346(b). "Even if specific behavior is statutorily required of a federal employee, the government is not liable under the FTCA unless state law recognizes a comparable liability for private persons." Ayala v. United States, 49 F.3d 607, 610 (10th Cir. 1995). Thus, the United States can be held liable in this case only if a "private individual under like circumstances" would be liable under the law of West Virginia.[1] See id. §§ 1346(b), 2674.

The court recognizes that "[a]ll waivers of sovereign immunity must be 'strictly construed . . . in favor of the sovereign.'" Welch v. United States, 409 F.3d 646, 651 (4th Cir. 2005) (quoting Lane v. Pena, 518 U.S. 187, 192 (1996)). In the FTCA context, "it is the plaintiff's burden to show that an unequivocal waiver of sovereign immunity exists and that none of the statute's waiver exceptions apply to his particular claim."

---

[1]     In determining whether West Virginia law would impose negligence liability on a "private individual under like circumstances" to the MSHA inspectors, the court notes that "the words 'like circumstances' do not restrict a court's inquiry to the same circumstances, but require it to look further afield." United States v. Olson, 546 U.S. 43, 46 (2005) (quoting Indian Towing Co. v. United States, 350 U.S. 61, 64 (1955) (emphasis in original)); see also Carter v. United States, 982 F.2d 1141, 1144 (7th Cir. 1992) ("The national government is never situated identically to private parties. Our task is to find a fitting analogue under private law.").

Id. (citing Williams v. United States, 50 F.3d 299, 304 (4th Cir.
1995)).  If the plaintiff cannot carry this burden, the suit
should be dismissed "for want of jurisdiction under Rule
12(b)(1)."  Williams, 50 F.3d at 304.

As an initial matter, the United States contends
dismissal is appropriate inasmuch as (1) the Mine Act does not
contemplate a private right of action, and (2) the FTCA does not
waive the United States' sovereign immunity for violations of
federal law.  These two assertions, however, misapprehend the
nature of plaintiffs' claims.  As clarified by their response,
plaintiffs are not asserting an independent claim under the Mine
Act or any other federal law.  Rather, within the scope of the
FTCA's waiver of sovereign immunity, plaintiffs only seek to
"establish that the improper conduct of the United States as
alleged in the Complaint would give rise to liability for a
private person under West Virginia law."  (Pl.'s Resp. 6
(emphasis added); see also Compl. ¶¶ 67-79 (asserting claims
"under West Virginia law")).

One other observation is warranted.  As noted, the
United States contends that "plaintiffs have failed to establish
a waiver of sovereign immunity."  (Def.'s Mot. to Dismiss 2).
The court does not understand this asserted defense as a
freestanding ground for dismissal.  Instead, if the United States

prevails in asserting that "plaintiffs' claims would not give rise to liability for a private person under West Virginia law," the absence of a sovereign immunity waiver inevitably follows. This is because the FTCA only waives sovereign immunity to the extent that a private person would be liable under state law.

With these clarifications, the court examines if the circumstances here alleged would give rise to liability for a private person under West Virginia law.

C.  Negligence Liability Under West Virginia Law

To establish a prima facie case of negligence in West Virginia, "the plaintiff must prove by a preponderance of the evidence that the defendant owed a legal duty to the plaintiff and that by breaching that duty the defendant proximately caused the injuries of the plaintiff." Neely v. Belk, Inc., 222 W. Va. 560, 568, 668 S.E.2d 189, 197 (2008) (quoting Webb v. Brown & Williamson Tobacco Co., 121 W. Va. 115, 118, 2 S.E.2d 898, 899 (1939)). Thus, "the threshold question in all actions in negligence is whether a duty was owed." Id. "No action for negligence will lie without a duty broken." Syl. Pt. 1, Parsley v. General Motors Acceptance Corp., 167 W. Va. 866, 280 S.E.2d 703 (1981). The determination of whether there is a duty is a

10

question of law and not a question of fact for the jury.  Syl.
Pt. 5, Aikens v. Debow, 208 W. Va. 486, 541 S.E.2d 576 (2000).

        Plaintiffs have confined themselves to three possible
bases for concluding that MSHA owed a duty to their decedents
under West Virginia law.  First, they assert "West Virginia law
is plain and clear -- a duty to exercise due care is imposed upon
anyone who voluntarily undertakes to aid another."  (Pl.'s Resp.
10).  Relying on this theory of liability, plaintiffs assert that
MSHA "voluntarily undertook"[2] a duty of care to the decedent
miners by conducting its safety inspections of the Alma Mine.
(Id.).  Second, plaintiffs contend that the MSHA inspectors owed
a duty to the miners based on general negligence principles.
(Id. 11-16).  Third, plaintiffs maintain that the existence of a
"special relationship" gave rise to a legal duty.  (Id. at 15).
The court considers each of plaintiffs' assertions in turn.

        1.    Duty Based on a "Voluntary Undertaking"

        Plaintiffs cite several cases they say support
imposition of a legal duty here based on a "voluntary

---

        [2]    Plaintiffs refer to this theory of liability as the
"voluntary undertaking" rule.  The court adopts the term for
simplicity sake but notes no West Virginia case elaborates upon
it.

undertaking" by the MSHA inspectors.  Plaintiffs repeatedly
emphasize that this voluntary undertaking rule differs from the
"Good Samaritan" provisions of the Restatement (Second) of Torts
§ 324A,[3] which the Supreme Court of Appeals of West Virginia has
neither adopted nor rejected.  (See Pl.'s Resp. 11 ("West
Virginia has not adopted the Restatement (Second) of Torts
sections on Good Samaritan liability" (emphasis in original));
id. 8 (noting that "West Virginia has chosen to craft its own
rules" regarding the voluntary undertaking of a legal duty)).[4]

---

[3]  Restatement (Second) of Torts § 324A provides:

One who undertakes, gratuitously or for consideration, to
render services to another which he should recognize as
necessary for the protection of a third person or his
things, is subject to liability to the third person for
physical harm resulting from his failure to exercise
reasonable care to protect his undertaking, if
    (a)  his  failure  to  exercise  reasonable  care
    increases the risk of such harm, or
    (b) he has undertaken to perform a duty owed by the
    other to the third person, or
    (c) the harm is suffered because of reliance of the
    other or the third person upon the undertaking.

[4]    As the United States points out, plaintiffs may be
emphasizing that West Virginia has not adopted the Restatement's
Good Samaritan provisions because many United States Courts of
Appeals have declined to impose good samaritan liability upon the
United States based on alleged negligent inspections by
government agencies. See, e.g., Dorking Genetics v. United
States, 76 F.3d 1261, 1267-69 (2d Cir. 1996) (USDA inspectors);
Ayala v. United States, 49 F.3d 607, 613 (10th Cir. 1995) (MSHA
inspectors); Myers v. United States, 17 F.3d 890 (6th Cir. 1994)
(MSHA inspectors); Howell v. United States, 932 F.2d 915, 920
(11th Cir. 1991) (FAA inspectors).

Given plaintiffs' efforts to avoid the Restatement's Good Samaritan provisions, and the parties' consequent lack of briefing on the matter, the court deems it inappropriate to analyze plaintiffs' claims under the Restatement standard and will only assess defendant's liability under settled West Virginia law.

Plaintiffs first rely on Adkins v. St. Francis Hosp., 149 W. Va. 705, 143 S.E.2d 154 (1965). There the court held that the doctrine of charitable immunity does not protect non-profit hospitals against medical negligence suits. Id. at 718, 143 S.E.2d at 162. In asserting that the court applied the voluntary undertaking rule, plaintiffs quote the following language from Adkins: "One who undertakes to aid another must do so with due care . . . Charity suffereth long and is kind, but in the common law it cannot be careless. When it is, it ceases to be kindness and becomes actionable wrongdoing." Id. at 716, 159.

Plaintiffs misread Adkins, in which the supreme court framed the question that it had under consideration:

> The basic question to be decided here, therefore, is whether a nonstock, nonprofit hospital should be liable for the torts of its servants, agents and employees, or is such an entity immune from such liability? In other words, should we abide by the rule or doctrine of charitable immunity as applied by this Court or should such rule be abrogated?

13

Id. at 705, 143 S.E.2d at 157 (emphasis added).  When placed in context then, the language cited by plaintiffs merely reflects, and analytically supports, the supreme court's rejection of the charitable immunity doctrine.  A statement of the voluntary undertaking rule appears neither in the syllabi nor the holding of the court.  Indeed, inasmuch as the case recognizes that medical professionals generally owe a duty of care to their patients, Adkins does not even implicate the voluntary undertaking rule.

Plaintiffs next cite Wingrove v. Home Land Co., 120 W. Va. 100, 196 S.E. 563 (1938).  In Wingrove, the defendant leased a gas station to a third party lessee.  Id. at 101, 196 S.E. at 564.  The lessee was responsible under the lease for all repairs, but the defendant-lessor nevertheless began performing repairs on the gas station's storage tanks.  Id.  The defendant's uncompleted repairs, however, left the premises in a dangerous condition, and this caused a fatal injury to one of the gas station's customers.  Id. at 101-02, 564-65.  The court determined that "[e]ven if the duty rested upon the lessee to make the repairs, that did not prevent the lessor from so doing; and when he elected to make them, he assumed an obligation to complete the work and restore the premises to their approximate

14

<u>condition at the time the repairs began</u>."  <u>Id.</u> at 102, 565

(emphasis added).  The court thus held as follows:

> We hold that, having <u>voluntarily assumed to repair the</u>
> <u>filling station</u> and having allowed a condition to be
> created from which patrons of the station might be
> injured, through its failure to complete the repairs, the
> lessor became liable for injuries sustained by persons
> lawfully on the premises.

<u>Id.</u> (emphasis added).


The <u>Wingrove</u> court imposed a legal duty "to complete

the work and restore the premises to their approximate condition

at the time the repairs began" only after finding that the

defendant voluntarily undertook performance of those repairs.

<u>Id.</u>  In other words, the court held that the defendant was

responsible for curing the hazardous condition that <u>it created</u>.

The court reads <u>Wingrove</u> to reflect an analogous principle found

in the Restatement's Good Samaritan provisions -- that is, an

individual undertakes a legal duty if he "affirmatively either

made, or caused to be made, a change in the conditions which

change created or increased the risk of harm."  <u>Myers v. United</u>

<u>States</u>, 17 F.3d 890, 892 (6th Cir. 1994) (citing Restatement

(Second) of Torts § 324A); <u>see</u> <u>also</u> <u>Howell v. United States</u>,932

F.2d 915, 919 (11th Cir. 1991) (noting that, under Restatement §

324A, an increase in risk occurs "when a nonhazardous condition

is made hazardous through the negligence of a person who changed

15

its condition or caused it to be changed.") (citations omitted).

Wingrove is readily distinguishable from this case.
Unlike the defendant in Wingrove, the MSHA inspectors did not
perform any repairs, alter any structures, or otherwise cause the
hazardous conditions in the mine.  On the contrary, it is
undisputed that Aracoma Coal created the dangerous conditions in
the mine.  Inasmuch as the MSHA inspectors neither made, nor
caused to be made, "a change in the conditions which change
created or increased the risk of harm," Wingrove does not support
plaintiffs' assertion that the MSHA inspectors voluntarily
undertook a legal duty to Bragg and Hatfield.

Finally, plaintiffs cite Neil v. Flynn Lumber Co., 71
W. Va. 708, 77 S.E. 324 (1913).  The plaintiff in Neil paid his
employer to provide him with medical care which was supposed to
be rendered by a "skillful physician or surgeon."  Id. at 708, 77
S.E. at 324.  After receiving lackluster medical treatment from a
non-physician provided by his employer, the plaintiff sued the
employer in tort and breach of contract.  Id.  The court held as
follows:

> Where an incorporated lumber company agrees with an
> employé . . . to furnish a competent and skilled
> physician to attend and treat him for any sickness or
> accident occurring while in its service, it is bound
> thereby to select and retain for that purpose a physician

16

> having the knowledge and skill ordinarily possessed by
> other members of his profession in the same community.
>
> Should the company fail to perform the duty so imposed,
> and by reason thereof the employé is injured, it is
> liable in damages to the servant, to the same extent as
> the physician himself would be were he sued for the
> injury.

Syl., id. at 708, 77 S.E. at 324.

Even assuming Neil applied the voluntary undertaking rule as plaintiffs contend, that case is inapplicable here.  To reiterate, the Neil court determined that, where an employee and employer enter into an agreement regarding the provision of medical services, the employer has a duty to exercise reasonable care in selecting a treating physician.  The court's decision thus hinged on the agreement which gave the employer discretion to choose a physician.  Since the parties in our case had no such agreement, Neil provides no support for plaintiffs' contention that the MSHA inspectors voluntarily undertook a legal duty to Bragg and Hatfield.

Plaintiffs' contentions are also undermined by the decision of the United States Court of Appeals for the Tenth Circuit in Ayala v. United States, 49 F.3d 607 (10th Cir. 1995), a case similar to this one.  In Ayala, the families of miners who died in a mine explosion brought a wrongful death action against

17

the United States, alleging that "[MSHA] gave negligent technical assistance" to the company that owned the mine, Mid-Continent. 49 F.3d at 609.  The plaintiffs contended that "the good samaritan (or assumed duty) doctrine dictates that MSHA owed a legal duty when it rendered technical assistance to Mid-Continent."  Id. at 612.  The Tenth Circuit rejected this assertion, reasoning that, under Colorado law, an "action taken to comply with legislative requirements can[not] properly be characterized as voluntarily assumed."  Id. at 613 (emphasis added and citations omitted).  Because "MSHA was compelled by statute to fulfill the obligation at issue," the court concluded that "assumption of duty analysis is inappropriate."  Id.

While the supreme court of appeals has had no opportunity to address this issue, the court anticipates that it would also view an action taken pursuant to a statute as an involuntary, rather than a voluntary, undertaking.  As the case discussion above demonstrates, the supreme court of appeals has only applied a precept akin to the voluntary undertaking rule when a defendant willfully performs a service that it had no pre-existing legal obligation to perform, as in Wingrove.  This court has no basis for concluding that the supreme court of appeals would extend this rarely-invoked and limited doctrine to cases

18

where a statute <u>compels</u> a defendant to engage in certain conduct, inasmuch as it strains logic to characterize such conduct as "voluntary."

Plaintiffs attempt to distinguish <u>Ayala</u> by noting that the Tenth Circuit relied on the "Good Samaritan" provisions of the Restatement (Second) of Torts § 324A in reaching its decision, whereas "West Virginia has chosen to craft its own rules" regarding the voluntary undertaking of a legal duty. (Pl.'s Resp. 8).  This is a distinction without a difference. While it appears West Virginia has not adopted the Restatement standard and has instead advanced a less-clearly defined "voluntary undertaking" rule, a plaintiff proceeding under the West Virginia rule must nonetheless show that the defendant <u>voluntarily</u> assumed a duty.  <u>See</u> <u>Wingrove</u>, 120 W. Va. at 102, 196 S.E. at 565.  Inasmuch as the <u>Ayala</u> court determined that MSHA's inspections and enforcement activities are not <u>voluntary</u> undertakings since these actions are <u>required</u> by statute, the reasoning of that case has persuasive force here.

Based on the foregoing, the court is of the view that the West Virginia court would not hold a private analogue to the MSHA inspectors liable based on a "voluntary undertaking" theory of liability.  The court next considers whether the West Virginia

19

court would impose a legal duty based on general negligence principles.

    2.   Duty Based on General Negligence Principles

        Speaking generally on the existence and scope of a legal duty in <u>Aikens v. Debow</u>, 208 W. Va. 486, 541 S.E.2d 576 (2000), the supreme court of appeals stated as follows:

> We recognized in <u>Robertson v. LeMaster</u>, 171 W.Va. 607, 301 S.E.2d 563 (1983), that while foreseeability of risk is a primary consideration in determining the scope of a duty an actor owes to another, "[b]eyond the question of foreseeability, the existence of duty also involves policy considerations underlying the core issue of the scope of the legal system's protection[.]" <u>Id.</u> at 612, 301 S.E.2d at 568. "Such considerations include the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant." <u>Id.</u>

<u>Id.</u> at 491, 541 S.E.2d at 581.  The court also added an important qualification to this standard:

> Tort law is essentially a recognition of limitations expressing finite boundaries of recovery . . . courts and commentators have expressed disdain for limitless liability and have also cautioned against the potential injustices which might result.  This Court's obligation is to draw a line beyond which the law will not extend its protection in tort, and to declare, as a matter of law, that no duty exists beyond that court-created line. It is not a matter of protection of a certain class of defendants; nor is it a matter of championing the causes of a certain class of plaintiffs. It is a question of public policy.

<u>Id.</u> at 502, 541 S.E.2d at 592.

        In advocating for the imposition of a legal duty,

plaintiffs assert that "the harm Mr. Bragg and Mr. Hatfield suffered was the tragic and undeniably foreseeable outcome of MSHA's gross negligence." (Pl.'s Resp. 12). They further claim that "Plaintiffs were the precise class of individuals who were intended to be protected by MSHA and the Mine Act, and that the harm they suffered . . . is exactly the kind of harm that MSHA was charged with preventing." (Id.).[5] In response, the United States points out that public policy is another factor, in addition to foreseeability, that the court must consider before imposing a legal duty, and that "as a policy matter, the responsibility for safety rests with the mine operator and the miner and not MSHA." (Def.'s Reply 11).

Irrespective of the foreseeability of risk factor, the court determines that overriding public policy concerns caution against imposing a legal duty upon the MSHA inspectors. The Mine Act makes clear that "mine operators retain the primary responsibility for safety in their mines." Ayala, 49 F.3d at 612

---

[5]    Although plaintiffs' contention (that the decedent miners were the precise class of individuals who were intended to be protected by MSHA and the Mine Act, and that the harm they suffered is exactly the kind of harm that MSHA was charged with preventing) seems to implicate the negligence per se standard, the court does not understand plaintiffs to assert a negligence per se theory of liability. Rather, plaintiffs appear to make this assertion only in aid of their view that the miners' deaths were a foreseeable result of MSHA's alleged negligence, which supports their argument concerning the imposition of a legal duty under general negligence principles.

(citing 30 U.S.C. § 801(e) ("the operators of such mines with the assistance of the miners have the primary responsibility to prevent the existence of such conditions and practices in such mines.")). As the Ayala court stated,

> [i]mposing a duty of care on MSHA when it provides technical assistance would, in effect, shift the responsibility for safety away from operators and onto MSHA. Despite plaintiffs' argument to the contrary, we do not think that MSHA substitutes itself for the mine operator when it provides technical assistance to operators.

Id.; see also Myers v. United States, 17 F.3d 890, 903 (6th Cir. 1994) (stating that holding the government liable for undertaking to fulfill a duty owed by an operator to its miners would require the court "to ignore [the] plain language" of 30 U.S.C. § 801). This court agrees with the reasoning of the Tenth and Sixth Circuits. Accordingly, the court declines to impose a legal duty upon MSHA inasmuch as the imposition of such a duty would directly conflict with Congress's decision to place the primary responsibility for mine safety on mine operators.[6]

---

[6]    Plaintiffs' reliance on Strahin v. Cleavenger, 216 W. Va. 175, 603 S.E.2d 197 (2004), in support of their position that a duty exists in this case is unavailing. The decision in Strahin noted that there is no general duty to protect against deliberate criminal conduct of third parties, but discussed two exceptions to this general rule that arise "(1) when a person has a special relationship which gives rise to a duty to protect another person from intentional misconduct, or (2) when the person's affirmative actions or omissions have exposed another to a foreseeable high risk of harm from the intentional misconduct." Id. at 184-85, 205-06 (citations omitted and emphasis added). Plaintiffs do not allege any intentional misconduct here -- their only claim sounds in negligence. Further, the court declines to

3.    Duty Based on a "Special Relationship"

Lastly, plaintiffs ask the court to impose a legal duty based on the existence of a "special relationship" between MSHA and the decedent miners.  (Pl.'s Resp. 15 n.6).  Plaintiffs cite Aikens v. Debow, 208 W. Va. 486, 541 S.E.2d 576 (2000), for the proposition that West Virginia courts generally will impose a duty where a special relationship exists.  (Id.).  The court disagrees with plaintiffs' reading of Aikens.  The Aikens court held as follows:

> We conclude that an individual who sustains purely economic loss from an interruption in commerce caused by another's negligence may not recover damages in the absence of physical harm to that individual's person or property, a contractual relationship with the alleged tortfeasor, or some other special relationship between the alleged tortfeasor and the individual who sustains purely economic damages sufficient to compel the conclusion that the tortfeasor had a duty to the particular plaintiff and that the injury complained of was clearly foreseeable to the tortfeasor.

Id. at 499, 589.  Viewed in context, Aikens does not represent "West Virginia's general recognition of a duty where a 'special relationship' exists," as plaintiffs claim.  (Pl.'s Resp. 15 n.6).  It instead stands for the narrower principle that an individual who sustains purely economic loss from an interruption in commerce due to another's negligence can recover when some

---

extend the exceptions discussed in Strahin so as to impose a duty to protect against a third party's mere negligent, as opposed to intentional, conduct.  Strahin is therefore inapplicable here.

special relationship exists between the parties that imposes a duty and is accompanied by foreseeability.  This is not such a case.

Additionally, the circumstances in which the supreme court of appeals has imposed a duty based on a special relationship differ markedly from the circumstances presented here.  The only relevant case cited by plaintiffs aptly illustrates this point.  See Eastern Steel Constructors v. City of Salem, 209 W. Va. 392, 401, 549 S.E.2d 266, 275 (2001) (holding that "a design professional (e.g. an architect or engineer) owes a duty of care to a contractor, who has been employed by the same project owner as the design professional and who has relied upon the design professional's work product in carrying out his or her obligations to the owner, notwithstanding the absence of privity of contract between the contractor and the design professional, due to the special relationship that exists between the two").

The relationship between the design professional and the contractor in Eastern Steel bears no resemblance to the relationship between the MSHA inspectors and the decedent miners here.  The contractor in Eastern Steel was required to rely on the design professional's work product in carrying out its contractual obligations to the owner.  See Eastern Steel, 209 W.

Va. at 401, 549 S.E.2d at 275 ("the contractor must rely on design documents to calculate his or her bid and, if successful in bidding, to construct the project").  In this case, by contrast, the miners were not required to rely on MSHA's work product in carrying out their obligations to Aracoma Coal Company.

After Eastern Steel, the supreme court of appeals appears reluctant to extend the special relationship doctrine. See Parkette, Inc. v. Micro Outdoors Advertising, LLC, 217 W. Va. 151, 157, 617 S.E.2d 501, 507 (2005)(noting that Eastern Steel "was a narrowly written case").  Two cases illustrate the limits. The first decision is Glascock v. City Nat. Bank of West Virginia, 213 W. Va. 61, 576 S.E.2d 540 (2002).  In Glascock, a bank and a married couple entered into a loan commitment to construct the couple's home.  The couple agreed that any inspections conducted on the home were solely for the bank's benefit and that the couple would not benefit therefrom.

A home inspection arranged by the bank at the couple's request revealed construction defects, and the builder was consequently terminated.  A second builder was later terminated as well after another, independent inspector was retained by the couple and submitted additional bad reports about the construction.  Thereafter the bank retained another inspector,

who also cited numerous defects.  The bank, however, did not share this final report with the homeowners and, additionally, convinced the homeowners thereafter to modify, arguably to their detriment, their loan obligation with the bank.  The homeowners instituted an action against the bank alleging it owed a duty to them, based upon the special relationship doctrine, to disclose the inspection report.

Under the circumstances presented, the supreme court of appeals concluded that the special relationship doctrine imposed a duty upon the bank.  The holding is quite narrow:

> [W]here a lender making a construction loan to a borrower creates a special relationship with the borrower by maintaining oversight of, or intervening in, the construction process, that relationship brings with it a duty to disclose any information that would be critical to the integrity of the construction project.

Glascock, 213 W. Va. at 67, 576 S.E.2d at 546 (emphasis added).

The circumstances in the instant case are quite different.  For example, the United States did not, as did the bank, intervene in the mine operation process.  Neither did it, like the bank, hire third parties to inspect the mine and protect any interest that the United States maintained in the mine.  The Glascock case offers no basis to extend the special relationship doctrine to this action.

The second case, White v. AAMG Const. Lending Center, 226 W. Va. 339, 700 S.E.2d 791 (2010), involved homeowners who asserted that a bank had a duty, inter alia, in tort not to distribute construction loan monies to the contractor until (1) the home had been properly inspected, and (2) it was confirmed that the work for which the contractor was being paid had actually been completed.  The supreme court of appeals concluded no duty arose, stating, inter alia, that there was no evidence that the bank withheld any information about the quality or integrity of the home.  Indeed, Glascock, was essentially distinguished on this ground.  Id. at 348, 700 S.E.2d at 800.  It is likewise the case here that plaintiffs' complaint does not allege that the United States withheld any information about the integrity of the mine.

In sum, based upon the relevant West Virginia case law, it does not appear that a private analogue to the MSHA inspectors would be held liable to the decedent miners under a special relationship theory.

D.   The Discretionary Function Exception

One further contention not raised by the United States warrants brief mention in light of controlling precedent.  See

<u>Medina v. United States</u>, 259 F.3d 220, 223-24 (4th Cir. 2001)
("If any of [the FTCA] exceptions apply, we are constrained to
dismiss Medina's complaint -- even though the Government has not
raised the issue -- inasmuch as the United States is immune from
suit 'without the consent of Congress.'") (citations omitted).
It is the discretionary function exception.

       As noted, the FTCA creates a limited waiver of the
United States' sovereign immunity by authorizing damage actions
for injuries "caused by the negligent or wrongful act or omission
of any employee of the Government while acting within the scope
of his office or employment . . . ."  28 U.S.C. § 1346(b)(1).
This waiver of sovereign immunity, however, is subject to several
exceptions, "[t]he most important of [which] is the discretionary
function exception."  <u>McMellon v. United States</u>, 387 F.3d 329,
335 (4th Cir. 2004) (en banc).

       The discretionary function exception provides that the
United States is not liable for "any claim . . . based upon the
exercise or performance or the failure to exercise or perform a
discretionary function or duty on the part of a federal agency or
an employee of the Government, whether or not the discretion
involved be abused."  28 U.S.C. § 2680(a).  The plaintiff bears
the burden of proving that the exception does not apply.  <u>Welch
v. United States</u>, 409 F.3d 646, 651 (4th Cir. 2005); ""<u>Kndemnity

28

Ins. Co. of North America v. United States, 569 F.3d 175, 180 (4th Cir. 2009).

Our court of appeals has, in at least one case, found that the discretionary function exception applies to inspections conducted by MSHA officials. See Estate of Bernaldes v. United States, 81 F.3d 428, 429 (4th Cir. 1996). In light of the preceding discussion resolving the United States' motion to dismiss on other subject matter jurisdiction grounds, however, the court need not adjudicate the applicability of this weighty FTCA exception. See Myers v. United States, 17 F.3d 890, 898-99 (6th Cir. 1994) ("Unless the plaintiffs have pled facts sufficient to justify liability under ordinary state-law principles, and thus invoked the court's subject matter jurisdiction under the general waiver of sovereign immunity in 28 U.S.C. § 2674, there is no need to resort to the exceptions in 28 U.S.C. § 2680").

### III.  Conclusion

The circumstances of this action are undeniably tragic. In light of the relevant West Virginia and federal case law, however, the court is unable to conclude that the substantive law of West Virginia, as presently assembled, would impose negligence

liability on a "private individual under like circumstances" to the MSHA inspectors, and hence, the United States in this case. The consequence of that missing private analogue necessarily establishes the United States' follow-on contention, namely, that plaintiffs cannot demonstrate "an unequivocal waiver of sovereign immunity" under the FTCA, <u>Welch</u>, 409 F.3d at 651.  The complaint must be dismissed for lack of subject matter jurisdiction.

The court accordingly ORDERS that the United States' motion to dismiss pursuant to Rule 12(b)(1) be, and it hereby is, granted.[7]

The Clerk is directed to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.

DATED: February 7, 2011

John T. Copenhaver, Jr.
United States District Judge

---

[7]  This disposition obviates the need to address the United States' remaining arguments in favor of dismissal or to consider further the apparently applicable discretionary function exception.